**HARTMAN & WINNICKI, P.C.**
Daniel L. Schmutter, Esq.
74 Passaic Street
Ridgewood, New Jersey 07450
Phone: (201) 967-8040
Fax:   (201) 967-0590
Attorneys for Defendants
Defense Distributed and Cody R. Wilson

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| GURBIR S. GREWAL, Attorney General of The State of New Jersey,<br><br>              Plaintiff,<br><br>v.<br><br>DEFENSE DISTRIBUTED, CODY R. WILSON, et al.<br><br>              Defendants. | CIVIL ACTION NO.18-cv-13248<br><br><br><br>**NOTICE OF REMOVAL**<br><br>[Previously pending in the Superior Court of New Jersey, Chancery Division, Essex County under Docket No. ESX-C-133-18] |

TO:   **THE JUDGES OF THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

**PLEASE TAKE NOTICE THAT** Defendants Defense Distributed and Cody R. Wilson, by and through their undersigned attorneys, file this Notice of Removal and hereby remove the above-titled civil action from the Superior Court of New Jersey, Chancery Division: Essex County, to this United States District Court for the District of New Jersey.  The removal occurs pursuant to 28 U.S.C. §§ 1441 and 1446 on the grounds of (1) complete preemption and (2) federally derived property pursuant to 28 U.S.C. § 1442.

## REMOVAL PROCEDURE

1.      Defense Distributed and Cody R. Wilson are Defendants in the civil action styled *Gurbir S. Grewal v. Defense Distributed, et al.*, Cause No. ESX-C-133-18, in the Superior Court of New Jersey, Chancery Division: Essex County.

2.      This notice is filed in the proper court because this is "the district court of the United States for the district and division embracing the place wherein [the state action] is pending."  28 U.S.C. §§ 1441(a); 1446(a); *see* 28 U.S.C. § 110 (New Jersey has one District and no divisions).

3.      This notice is timely because it is "filed within 30 days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based." 28 U.S.C. § 1446(b)(1).  Plaintiff filed the state action's initial pleading setting forth the claim for relief on July 30, 2018 and Defendants were served with process on August 6, 2018.  Defendants file this notice on August 27, 2018.

4.      This notice includes a copy of all process, pleadings, and orders served on Defendants in the state action, Ex. B, and an index of these documents, Ex. A. *See* 28 U.S.C. § 1446(a).

5.      All Defendants whose consent is needed consent to removal. *See* 28 U.S.C. § 1446(b)(2)(A).[1]

---

[1] In addition to Defense Distributed and Mr. Wilson, Plaintiff named several unidentified "Doe" defendants and did not serve them. Complaint at 5.  These defendants need not consent to removal to satisfy the unanimity rule. *See Doughtery, Clifford & Wadsworth, Corp. v. Magna Group, Inc.*, No. 07–1068 (HAA), 2007 WL 2579406, at *3 (D.N.J. June 19, 2007) ("The unanimity rule may be disregarded where: (1) a non-joining defendant is an unknown or nominal party; or (2) where a defendant has been fraudulently joined."), *report and recommendation adopted*, No. 07-1068 (HAA), 2007 WL 2300719 (D.N.J. Aug. 6, 2007).  Henceforth, this notice's references to "Defendants" are meant to include only Defense Distributed and Mr. Wilson.

6.    After filing this notice, Defendants will give written notice thereof to all adverse parties and file a copy of the notice with the clerk of such State court. *See* 28 U.S.C. § 1446(d).

## REMOVAL GROUNDS

7.    First, Defendants invoke their right to remove "any civil action brought in a State court of which the district courts of the United States have original jurisdiction." 28 U.S.C. § 1441(a).  The district courts' original jurisdiction includes "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.  This action can be removed under Section 1441 because federal law completely preempts Plaintiff's case against Defendants. *See Beneficial Nat. Bank v. Anderson*, 539 U.S. 1 (2003).

8.    Second, Defendants invoke the right to remove any "civil action . . . that is commenced in a State court and that is against or directed to . . . [a] property holder whose title is derived from any such officer [of the United States], where such action or prosecution affects the validity of any law of the United States." 28 U.S.C. § 1442(a)(2).  This action can be removed under Section 1442 because Defense Distributed holds property—a license to engage in distribution of certain computer files—that is derived from the Acting Deputy Assistant Secretary of State for Defense Trade Controls.  Specifically, Plaintiff's suit attempts to use common law nuisance and negligence claims to prohibit exports authorized under a federal license.

## GROUND 1: COMPLETE PREEMPTION

9.    To determine whether a removed action "aris[es] under" federal law for purposes of  28 U.S.C. § 1441, courts begin with the well-pleaded complaint rule: "[A] suit arises under the Constitution and laws of the United States only when the plaintiff's statement of his own cause of action shows that it is based upon those [federal] laws or that Constitution." *Beneficial Nat. Bank v. Anderson*, 539 U.S. 1, 6 (2003).  The resulting "general rule" is that, "absent diversity

jurisdiction, a case will not be removable if the complaint does not affirmatively allege a federal claim." *Id.*

10.    Federal preemption defenses trigger the need for two different kinds of subsidiary rules.  There is "an important distinction between what have come to be called the 'complete' preemption and the 'ordinary' preemption by federal law of a claim that appears to be based on state law." 14B Charles Alan Wright & Arthur B. Miller, et al., Federal Practice & Procedure: Jurisdiction and Related Matters § 3722.2 (4th ed. West 2018) (hereinafter Wright & Miller). "This distinction has serious implications for the availability of removal." *Id.*

11.    Generally, the well-pleaded complaint rule holds that the presence of federal preemption *defense* does not make a state law action "aris[e] under" federal law. *Id.*  When "the plaintiff chooses to assert a claim based solely on state law, and that state law claim continues to exist, preemption can be only a defense." *Id.*  Here, "[o]rdinary preemption will not permit removal." *Id.*

12.    There is an exception to this general rule: complete preemption.  Courts describe preemption as "complete" in a case where "federal law does not merely preempt a state law to some degree; rather, it substitutes a federal cause of action for the state cause of action, thereby manifesting Congress's intent to permit removal." *Id.*  State law claims that are completely preempted actions are "'necessarily federal' so that they are removable to federal court." *Id.*

13.    The complete preemption doctrine applies even where, as here, "a plaintiff files suit in state court, ostensibly upon a state law cause of action." *Id.*  Once "the defendant removes the case on the basis of complete preemption, the federal district court that is persuaded that plaintiff's claim is completely preempted will recharacterize the plaintiff's cause of action as a federal claim for relief, making the removal proper on the basis of federal question jurisdiction." *Id.*

4

14.     *Beneficial National Bank v. Anderson*, 539 U.S. 1 (2003), defines the modern doctrine of complete preemption in clear terms.  Complete preemption makes an action "aris[e] under" federal law regardless of how the complaint casts the claim:

> When the federal statute completely pre-empts the state-law cause of action, a claim which comes within the scope of that cause of action, even if pleaded in terms of state law, is in reality based on federal law.  This claim is then removable under 28 U.S.C. § 1441(b), which authorizes any claim that "arises under" federal law to be removed to federal court.

*Id.* at 8.

15.     Complete preemption occurs "when a federal statute wholly displaces the state-law cause of action" by implementing an "exclusive [federal] cause of action." *Beneficial Nat'l Bank*, 539 U.S. at 8-9.  "In concluding that a claim is completely preempted, a federal court finds that Congress desired not just to provide a federal defense to a state law claim but also to replace the state law claim with a federal law claim and thereby give the defendant the ability to seek adjudication of the claim in federal court." Wright & Miller § 3722.2.

16.     This test departs from a former, more-restrictive one.  Prior to *Beneficial National Bank*, courts identifying complete preemption "focused on Congressional intent, in particular on whether Congress intended particular claims to be removable." Wright & Miller §  3722.2.  This old framework was supplanted when "*Beneficial National Bank* insisted that the proper inquiry is whether Congress intended the federal cause to be exclusive, rather than whether Congress intended the cause to be removable." *Id.*

17.     Following *Beneficial*, the Third Circuit has recognized that certain statutes that may not have satisfied the old complete preemption test, can satisfy the current complete preemption test: the Securities Litigation Uniform Standards Act, *Rowinski v. Salomon Smith Barney Inc.*, 398 F.3d 294, 298 (3d Cir. 2005), the National Bank Act, *In re Cmty. Bank of N. Va.*, 418 F.3d 277,

294-95 (3d Cir. 2005), and the Depository Institutions Deregulation and Monetary Control Act, *id.*

18.     Foreign policy and national security decisions are "wholly confided by our Constitution to the political departments of the government, Executive and Legislative." *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948); *see also* U.S. Const. Art. I, Sec. 8, Cl. 3 (power to regulate interstate and foreign commerce); U.S. Const. Art. II, Sec. 2, Cl. 2.

19.     "Practically every volume of the United States Statutes contains one or more acts or joint resolutions of Congress authorizing actions by the President in respect of subjects affecting foreign relations, which either leave the exercise of the power to his unrestricted judgment or provide a standard far more general than that which has always been considered requisite with regard to domestic affairs." *United States v. Curtis-Wright Export Corp.*, 299 U.S. 304, 324 (1936). Historically, many of these statutes have related to the importation and exportation of weapons and technology that has military applications. *Id.* (citing statutes dating back to 1795).

20.     "[W]hen Congress uses far-reaching words in delegating authority to the President in the area of foreign relations, courts must assume, unless there is a specific contrary showing elsewhere in the statute or in the legislative history, that the legislators contemplate that the President may and will make full use of that power in any manner not inconsistent with the provisions or purposes of the Act." *S. Puerto Rico Sugar Co. Trading Corp. v. United States*, 334 F.2d 622, 632 (Cl. Ct. 1964) (internal quotation marks omitted); *see also Curtis- Wright Export Corp.*, 299 U.S. at 324.

21.     The Arms Export Control Act ("AECA"), 22 U.S.C. ch. 39, operates in "furtherance of world peace and the security and foreign policy of the United States." 22 U.S.C. § 2778(a)(1).  To that end, the AECA provides that "the President is authorized to control the import

and the export of defense articles and defense services and to provide foreign policy guidance to persons of the United States involved in the export and import of such articles and services." 22 U.S.C. § 2278(a)(1).  Furthermore, Congress authorized the "President . . . to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services." *Id.*

22.     As relevant to this case, through the AECA, Congress authorized the President to grant or deny licenses to export defense articles, which includes technical data. 22 U.S.C. § 2778(g)(6) ("The President may require a license . . . before any item on the United States Munitions List is sold or otherwise transferred to the control or possession of a foreign person[.]"). The AECA also provides that a license to export defense articles "may be revoked, suspended, or amended by the Secretary of State, without prior notice, whenever the Secretary deems such action to be advisable." 22 U.S.C. § 2791(e)(2)(A); *see also* 22 C.F.R. § 126.7(a).

23.     On March 8, 2013, through Executive Order 13637, President Obama delegated his Constitutional and statutory authority to control the export of defense articles to the Secretary of State.  Pursuant to this delegation, the State Department administers the AECA through the regulatory regime known as the "ITAR"—the International Traffic in Arms Regulations, 22 C.F.R. parts 120-130.

24.     On July 27, 2018, the State Department acted in accordance with both the AECA and the President's delegated authority to issue Defense Distributed a license under ITAR Section 125.4(b)(13). Ex. C.  This license was derived from the Acting Deputy Assistant Secretary of State for Defense Trade Controls.  That same day, the State Department acted in accordance with both the AECA and the President's delegated authority to issue a temporary modification under ITAR Section 126.2 authorizing publications and other exports of certain files. Ex. D.  These actions

7

expressly permit Defense Distributed to publish, export, and otherwise distribute the files at issue here.

25.    Plaintiff brought suit against Defendants to "immediately halt Defendants from publishing, **exporting** and/or distributing the printable-gun computer files." Complaint at ¶ 4 (emphasis added).  He asserts two claims labeled as New Jersey tort actions: a New Jersey tort action for "public nuisance," *id.* at 18-19, ¶¶ 59-64, and a New Jersey tort action for "negligence," *id.* at 19-20, ¶¶ 6569.  He claims that both tort actions entitle the Plaintiff to injunctive relief.  *Id.* at 20.

26.    Plaintiff's claims undermine the AECA, the ITAR, and the State Department's exercise of the President's delegated authority thereunder.

27.    By seeking to enjoin Defendants with New Jersey law's "public nuisance" and "negligence" actions, the Plaintiff is effectively seeking to have New Jersey tort law take over the President's job of "control[ling] the import and the export of defense articles." § 2778(a)(1).  New Jersey's "public nuisance" and "negligence" actions for injunctive relief are *completely* preempted by federal law.

28.    Evidence of complete preemption runs throughout the AECA.  For example, one of Congress's most fundamental objectives was to vest *one and only one* entity with authorization "to control the import and the export of defense articles and defense services." 22 U.S.C. § 2778(a)(1).  The only entity it vested that authority with is "the President." *Id.*  The New Jersey Attorney General seeks to prohibit, through the exercise of state law, the precise action that Congress delegated to the executive branch, and the executive branch alone.

29.     States have no role to play in the regulation of foreign commerce. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 375 (2000); *Nat'l Foreign Trade Council, Inc. v. Giannoulias*, 523 F. Supp. 2d 731, 738-742 (N.D. Ill. 2007).  Their governors do not, their legislatures do not, and their courts certainly do not either.

30.     Additionally, the AECA maintains that its regime of export and import control operates "[i]n furtherance of world peace and the security and foreign policy of the United States." 22 U.S.C. § 2778(a)(1).  This court can safely assume that Congress intended to entirely exclude States from the process of governing arms control law, "world peace and the security and foreign policy of the United States."

31.     Federal arms export control law "wholly displaces the state-law cause[s] of action." *See Beneficial Nat'l Bank*, 539 U.S. at 8-9.

32.     *Beneficial*'s second prong requires that federal law implements an "exclusive [federal] cause of action." *Beneficial Nat'l Bank*, 539 U.S. at 8-9.

33.     Here, the AECA supplies a robust enforcement scheme with *exclusive* causes of action.

34.     22 U.S.C. § 2778(c) provides criminal penalties for violations of the AECA or ITAR: "shall upon conviction be fined for each violation not more than $1,000,000 or imprisoned not more than 20 years, or both."

35.     22 U.S.C. § 2778(e) provides for a civil action that can be brought against anyone in violation of AECA statutory provisions or ITAR regulations and authorizes the Secretary of State to "assess civil penalties for violations" of the AECA and ITAR.

36.     22 U.S.C. § 2279a(c) provides for a civil action that can be brought against anyone in violation of AECA statutory provisions regarding incentive payments for satisfying offset agreements and authorizes the Secretary of State to "assess civil penalties" for such violations.

37.     22 U.S.C. § 2780(k) provides for a civil action that can be brought civil action concerning transactions with countries supporting acts of international terrorism.  Plaintiff is simply incorrect that state law can be used as a means to guard against this specter of terrorism. *See* Complaint at 2, ¶2; *id.* at 10, ¶27(b); *id.* at 11, ¶27(c) (similar).

38.     Additionally, pursuant to delegated authority under the AECA, the State Department administers ITAR Section 127.7. This regulation sets forth a cause of action for administrative debarment to "prohibit any person from participating directly or indirectly in any activities that are subject" to the AECA and its implementing regulations under the ITAR. *See* 22 C.F.R. § 127.7(a).

39.     The State Department may seek administrative debarment under ITAR Section 127.7(a) through the comprehensive process set forth at ITAR Part 128.  The latter provision specifies the steps that must come before the issuance of "an order debarring the respondent from participating in the export of defense articles or technical data"—namely, the charge, notice, discovery, hearing, appeal, and other procedural rights. 22 C.F.R. § 128.10.  The administrative law judge presiding over the disbarment process "may conform any part of the proceedings before him or her to the Federal Rules of Civil Procedure." 22 C.F.R. § 128.9(a).

40.     The State Department has the exclusive authority to issue, revoke, suspend, or amend the authorizations for the export of the technical data subject to Plaintiff's claims.  The ITAR debarment process that implements an "exclusive [federal] cause of action." *Beneficial Nat'l*

*Bank*, 539 U.S. at 8-9.   The process constitutes a superseding federal action that supplants Plaintiff's claims against Defendants in the present action.

41.     Finally, it is irrelevant that the Plaintiff's desired remedy cannot be obtained pursuant to the "exclusive [federal] cause of action." Indeed, there is no requirement that such an "exclusive [federal] cause of action" provides a remedy for the Plaintiff.   In *Caterpillar, Inc. v. Williams*, 482 U.S. 386 (1987), the Supreme Court expressly rejected the idea that "a case may not be removed to federal court on the ground that it is completely pre-empted unless the federal cause of action relied upon provides the *plaintiff* with a remedy." *Id.* at 391 n.4 (emphasis added). Instead, *Caterpillar* holds that a statute accomplishes complete preemption even when "the relief sought by the plaintiff could be obtained only in state court." *Id.*; *accord Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 23 (1983) (complete preemption occurs even when a plaintiff has "sought a remedy available only under state law" (emphasis in original)).

42.     Recent complete-preemption decisions follow this rule. An exemplary holding comes from *Fayard v. Northeast Vehicle Services, LLC*, 533 F.3d 42 (1st Cir. 2008): "For complete preemption to operate, the federal claim need not be co-extensive with the ousted state claim. On the contrary, the superseding federal scheme may be more limited or different in its scope and still completely preempt." *Id.* at 46 (citing *Caterpillar*); *accord Young v. Anthony's Fish Grottos, Inc.*, 830 F.2d 993, 998-99 (9th Cir. 1987) ("if federal law completely preempts a state law claim and supplants it with a federal claim, the state law claim may be removed to federal court even if federal law fails to provide the plaintiff with remedies available under state law").

43.     Both elements of *Beneficial*'s complete preemption test are satisfied.   Plaintiff's so-called New Jersey tort claims fall within the scope of the AECA and constitute an action arising under federal law for purposes of determining removability under 28 U.S.C. § 1441(b).

11

## GROUND 2: FEDERALLY-DERIVED PROPERTY

44.     28 U.S.C. § 1442(a) provides Defendants with an additional ground for removal. That statute provides, in relevant part, a right of removal for certain holders of federally-derived property:

>   (a)     A civil action or criminal prosecution that is commenced in a State court and that is against or directed to any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:
>
>       (1)     The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.
>
>       (2)     A property holder whose title is derived from any such officer, where such action or prosecution affects the validity of any law of the United States.

28 U.S.C. § 1442(a).

45.     Removal under Section 1442(a)(2) implicates two distinct questions: (1) is the defendant a "property owner," whose "title" to that "property" is "derived" from an officer of the United States; and (2) does the state court action "affect[] the validity of any law of the United States."  Here, the answer to both questions is "yes."

46.     First, Defense Distributed has a relevant personal property: namely, a license that permits the "unlimited distribution" of certain files "for public release."  Ex. C.  Nothing in the text, history, or purpose of Section 1442(a)(2) limits the term "property" to *real* property.  Indeed, it is well established that one can hold "title" to personal, as well as real, property.  Government-issued licenses constitute an important and valuable species of personal property.

12

47.     Moreover, Defense Distributed's "title" to the "property" is "derived" from an officer of the United States.  In this case, the "Acting Deputy Assistant Secretary for the Directorate of Defense Trade Controls" issued the license.  In every sense, the license is "derived" from—and can be taken away by—the federal government. *See B-West Imports v. U.S.*, 75 F.3d 633, 638 (Fed. Cir. 1996).  Defense Distributed's license is best viewed as an authorization from the federal government to facilitate the transfer of information in interstate and foreign commerce—an area where the federal government's authority is at its apogee.

48.     Second, the Plaintiff's suit "affects the validity" of federal export control law.  In a press release, Attorney General Grewal boasted that he seeks to override the federal government's licensing framework: "The federal government is no longer willing to stop Defense Distributed from publishing this dangerous code, and so New Jersey must step up."[2]  New Jersey can no more prohibit the operation of a federally licensed export framework than New York could prohibit the operation of a federally licensed boat, *see Gibbons v. Ogden*, 22 U.S. 1 (1824), or Maryland could prohibit the operation of a federally chartered bank. *See McCulloch v. Maryland*, 17 U.S. 316 (1819).  Indeed, the Plaintiff seeks to use common law nuisance and negligence claims to frustrate the State Department's exclusive authority over foreign and interstate commerce. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 375 (2000); *Nat'l Foreign Trade Council, Inc. v. Giannoulias*, 523 F. Supp. 2d 731, 738-742 (N.D. Ill. 2007).

---

[2] AG Grewal Demands That Gun Developer Halt Plans to Publish Printable-Gun Computer Files; Threatens Imminent Legal Action, Office of the Attorney General (July 26, 2018), https://nj.gov/oag/newsreleases18/pr20180726c.html.

13

49.     Unlike with traditional removal cases under Section 1441, a complaint "may be removed" under Section 1442, "despite the nonfederal cast of the complaint; the federal question element is met if the defense depends on federal law." *See Jefferson Cty., Ala. v. Acker*, 527 U.S. 423, 430–31 (1999) (citing *Mesa v. California*, 489 U.S. 121 (1989)).  In other words, the well-pleaded complaint rule is inapplicable to removals under Section 1442.  This case is perfectly suited for removal under 28 U.S.C. § 1442(a)(2).

### A.     Section 1442(a)(2), and Its Predecessors, "Make Available the Federal Forum to Certain Property Title Holders"

50.     The current version of 28 U.S.C. § 1442(a)(2) was enacted in 1948.  However, this provision traces its roots back to the Antebellum era.  From the earliest days of our Republic, Congress recognized the importance of removing cases from state court that implicated federal officers, as well as private citizens who operated under a federal charge.

51.     In 1833, for example, Congress enacted "An act further to provide for the collection of duties on imports." Ch. 57, § 3, 4 Stat. 633. *See Town of Stratford v. City of Bridgeport*, 434 F. Supp. 712, 713-14 (D. Conn. 1977). This provision permitted removal to federal court of state-court actions filed "against any officer of the United States, or other person, for or on account of any act done under the revenue laws of the United States, or under colour thereof."  Critically, the statute was not limited to removing cases in which government officials were sued.  The statute also covered suits against private citizens who helped to implement federal revenue laws—namely debt collectors.

52.     Following the Civil War, in 1866, Congress enacted a broader removal statute that was "somewhat closer to the present language of § 1442(a)(2)." *Bridgeport*, 434 F. Supp. at 714 (citing ch. 184, § 67, 14 Stat. 171).  This Reconstruction-Era statute permitted removal of state-court actions filed "against any revenue officer of the United States 'or against any person holding

property or estate by title derived from any such officer, concerning such property or estate, and affecting the validity of this (revenue) act or acts of which it is amendatory.'" *Id.*  Again, suits could be removed to federal courts if they involved *either* a federal "revenue officer of the United States," or a private citizen who held "property or estate by title derived" from such an officer. Once again, Congress sought to prevent state governments from burdening the operation of federal law, by targeting federal officials, and their licensees.

53.     In 1948, Congress revised this removal provision as part of "the comprehensive revision of Title 28." *Bridgeport*, 434 F. Supp. at 714.  This language has remained unchanged for seven decades.  Then, as now, § 1442(a)(2) permits removal in a civil action wherein "[a] property holder whose title is derived from any such officer [of the United States], where such action or prosecution affects the validity of any law of the United States."

54.     This new phrasing resulted in three significant changes. First, Congress "dropped" the prior version of the statute's "limitation . . . to revenue officers and their successors and to revenue laws." *Id.*  Now, "property" derived from *any* officer of the United States—and not just revenue collectors—would provide a basis for removal.   Second, removal is now permitted "whenever the suit affected the validity of '*any law* of the United States.'" *Bridgeport*, 434 F. Supp. at 714 n.1 (emphasis added).  The suit no longer needed to "affect[] the validity of any such *revenue law*."  Third, the statute no longer distinguished between "property" and "estate."  *All* types of property—real and personal—were included under the broad umbrella category of "property."

55.     The United States District Court for the District of Connecticut observed that "[t]he Reviser's Note" in 1948 provided "no explanation for the change." *Bridgeport*, 434 F. Supp. at 714 n.1.  However, there is no question that the revision "broadened" the scope of the removal statute.

*Id.* The United States District Court for the District of Puerto Rico reaffirmed the longstanding, "underlying purposes of" this statute: to "make available the federal forum to certain property title holders . . . while at the same time, ensur[ing] the general protection of the laws enacted by Congress, which federal judges are sworn to righteously interpret and uphold." *Benitez-Bithorn v. Rossello-Gonzalez*, 200 F. Supp. 2d 26, 31 (D.P.R. 2002).

**B. Defendant Has "Title" to a License that is "Derived" From an "Officer" of the United States, and the Plaintiff's State-Court Claims "Affect[] the Validity" of Federal Export Control Law.**

56. Since its enactment in 1948, Section 1442(a)(2) has been, admittedly, "seldom-invoked." 14C Wright & Miller § 3726. The United States District Court for the District of Puerto Rico recognized that "there are few cases interpreting" this "special removal statute." *Benitez-Bithorn*, 200 F. Supp. 2d at 31, 33. Although Defendants have not found any reported decisions from the Third Circuit interpreting this unique ground for removal, in *Benitez-Bithorn*, that "lack of jurisprudence [did] not foreclose a finding that [the] Court ha[d] jurisdiction" under § 1442(a)(2). *Id.* So too here.

57. Section 1442(a)(2) implicates two distinct questions: (1) is the defendant a "property owner," whose "title" to that "property" is "derived" from an officer of the United States; and (2) does the state court action "affect[] the validity of any law of the United States." Here, the answer to each question is "yes." The Defendant has "title" to a license that is "derived" from an "officer" of the United States, and the Plaintiff's state-court claim "affects the validity" of federal export control law. Like in *Benitez-Bithorn*, the New Jersey Attorney General "has sued a defendant which Congress has undisputably granted a right to removal through a special removal statute." 200 F. Supp. at 33. Removal is warranted under § 1442(a)(2).

16

### 1. Defense Distributed's "Title" to The License is "Derived" from A Federal Officer

58. Section 1442(a)(2) applies to a "property holder whose title is *derived* from an" officer of the United States. Consistent with the President's role as Commander and Chief, and the delegation of Congress's powers under the Commerce and Necessary and Proper Clauses, Congress has conferred the President with the exclusive authority to issue licenses and other forms of authorizations for the export of technical data on firearms controlled under the AECA. The President delegated this authority to the State Department pursuant to Executive Order 13637 of March 8, 2013.

59. On July 27, 2018, the Acting Deputy Assistant Secretary of State for Defense Trade Controls issued Defense Distributed a license pursuant to the State Department's exclusive authority under the AECA. *See* ¶ 48, Ex. C. This license expressly authorizes Defense Distributed to publish certain files for "unlimited distribution" in interstate and foreign commerce, pursuant to ITAR Section 125.4(b)(13).

60. In *Benitez-Bithorn*, the court found this first prong of § 1442(a)(2) was satisfied because "[t]he title of said property is derived from an officer of the United States, namely, Duncan Holaday, Deputy Assistant Secretary of the Navy." *Benitez-Bithorn v. Rossello-Gonzalez*, 200 F. Supp. 2d 26, 31 (D.P.R. 2002). Here too, the Acting Deputy Assistant Secretary of State for Defense Trade Controls is an officer of the United States. And the Defendant's "title" to the license is "derived" from that officer.

61. Critically, Defense Distributed has no independent "property interests in foreign commerce." *U.S. Ordnance*, 432 F.Supp.2d 99. The Supreme Court has recognized that "no one can be said to have a vested right to carry on foreign commerce with the United States." *The Vessel Abby Dodge v. United States*, 223 U.S. 166, 176-77 (1912).

62.     Rather, under current federal export control law, Defense Distributed can participate in foreign and interstate commerce so long as it is licensed to do so by the State Department.  That is, it acts under the auspices of the State Department.  In every sense, the license is "derived" from—and can be taken away by—the federal government. *B-West Imports*, 75 F.2d at 638.

63.     Defense Distributed's license is best viewed as an authorization from the federal government to facilitate the transfer of information in interstate and foreign commerce—an area where the federal government's authority is at its apogee.  Until that license is revoked, the Defendant retains "title" to that property interest, which is "derived from" a federal officer. Critically, that license cannot be nullified by state law.  This element of § 1442(a)(2) is therefore satisfied.

## 2.     Defense Distributed Has "Title" to, and is the "Property Owner" of, a Valuable License

64.     Section 1442(a)(2) applies to a "*property holder whose title is derived from an*" officer of the United States.  Defense Distributed is a "property holder" of the license from the State Department.   Moreover, Exhibit E demonstrates that Defense Distributed's license is extremely valuable property that can enhance the value of a business's assets.  The fact that this personal property is not assignable without the government's permission merely removes a single stick from the bundle of rights; the license remains a valid property interest. *See Andrus v. Allard*, 444 U.S. 51 (1979).

65.     One court rejected the argument that § 1442(a)(2) applies to "a 'property right' in [the Defendant's] contract" that was "derived" from the United States Navy. *See St. Bernard Port, Harbor & Terminal Dist. v. Violet Dock Port, Inc. LLC*, 809 F. Supp. 2d 524, 534 (E.D. La. 2011). That court found that "the term 'title' implies that the statute applies only to real property and not

18

a contractual 'property right.'" *Id.*  Respectfully, this conclusion conflates well-settled doctrines

of property law and is contrary to the text, history, and purpose of § 1442(a)(2).

66.     As a threshold matter, the United States District Court for the Eastern District of

Louisiana was simply incorrect that the concept of "title" is limited to real property, rather than to

personal property.  William Blackstone recognized in his celebrated *Commentaries on the Laws*

*of England* that one can have "title" to "movables of every kind." Vol. 1, Book 1, Chap. 1 at 5

(1753), http://bit.ly/2KKB1Mu, that is, personal property. *Pierson v. Post*, a case familiar to all

first-year law students, recognized that one can gain "title of occupancy" to a wild animal, such as

a fox. 3 Caines 175 (N.Y. 1805).  Again, personal property.  Indeed, throughout the history of the

Republic, the Supreme Court reaffirmed time and again that one can have "title" to "personal

property."[3]

---

[3] *See e.g., Brewster v. Gage*, 280 U.S. 327, 334 (1930) ("Upon acceptance of the trust there vests in the administrators or executors, as of the date of the death, *title to all personal property* belonging to the estate.") (emphasis added); *Forbes v. Gracey*, 94 U.S. 762, 766 (1876) ("It is then free from any lien, claim, or title of the United States, and is rightfully subject to taxation by the State as any other personal property is."); *Mitchell v. Hawley*, 83 U.S. 544, 550 (1872) ("No one in general can sell personal property and convey a valid title to it unless he is the owner or lawfully represents the owner. Nemo dat quod non habet."); *Wilkins v. Ellett*, 76 U.S. 740, 742, 19 L. Ed. 586 (1869) ("is invested with the title to all the personal property of the deceased"); *Livermore v. Jenckes*, 62 U.S. 126, 138 (1858) ("If, then, the assignment is valid by the *lex domicilii* and by the *lex loci contractus*, it operated to pass a legal title to the assignees to the personal property in the State of New York."); *Gibson v. Stevens*, 49 U.S. 384, 401 (1850) ("The same rule applies to a mortgagee of personal property holding the legal title and possession to secure his advances."); *Townsend v. Jemison*, 50 U.S. 407, 419, 13 L. Ed. 194 (1850) ("all titles to real and personal property"); *Bank of U.S. v. Tyler*, 29 U.S. 366, 380 (1830) ("The lien attaches only from the delivery of the execution to the sheriff. It then binds real and personal property, held by legal title."); *Kerr v. Moon's Devisees*, 22 U.S. 565, 570–71 (1824) (Washington, J.) ("It can by no means be admitted, that this is to be considered in the light of personal property, notwithstanding the title of Moon rested merely upon a legislative reservation in his favour by the State of Virginia").

67.     Likewise, federal law is replete with references to citizens holding "title" to real *and* personal property.[4]  And federal law routinely provides protection for intangible personal property, such as licenses.  For example, in the intellectual property context, "federal statutory law classifies patents as personal property." *In re Alltech Plastics, Inc.*, 71 B.R. 686, 689 (Bankr. W.D. Tenn. 1987).  In a related context, the Third Circuit observed that a liquor "license was not real property but rather was personal property." *Hudson Cty. Bd. of Chosen Freeholders v. Morales*, 581 F.2d 379, 383 (3d Cir. 1978).  A license is best viewed as a species of personal property.

68.     Moreover, the history of Section 1442(a)(2) further supports the conclusion that "property" encompasses real *and* personal property.  An earlier version of this statute enacted in 1866 applied to "any person holding *property or estate* by title derived from any such officer, concerning such property or estate, and affecting the validity of this (revenue) act or acts of which it is amendatory.'" *Bridgeport*, 434 F. Supp. at 714 (citing ch. 184, § 67, 14 Stat. 171). This iteration of the statute expressly countenanced persons holding both "property" and "estate."  The latter term would generally be understood to concern *real* property.  The former term, then, would also embrace *personal* property.  However, in 1948, when the statute was revised, Congress

---

[4] *See e.g.,* 34 U.S.C. § 10227 ("title to all expendable and nonexpendable personal property"); 12 U.S.C. § 1710 ("That a conveyance or transfer of title to real or personal property or an interest therein"); 48 U.S.C.A. § 1971 ("all right, title, and interest of the Government of the United States in personal property"); 16 U.S.C.A. § 79c-1 ("all right, title, and interest in, and the right to immediate possession of, all real property and all down tree personal property"); 25 U.S.C. § 1495 ("Title to any personal property purchased with loans guaranteed or insured hereunder shall be taken in the name of the purchaser."); 25 U.S.C. § 1466 ("Title to any personal property purchased with a loan from the revolving loan fund shall be taken in the name of the purchaser."); 22 U.S.C.A. § 1381 ("There shall remain vested in the Government of the United States or its agencies or instrumentalities all the right, title, and interest of the said Government or its agencies or instrumentalities to all real and personal property within the Philippine Islands as may now be vested in, or later be acquired by the Government of the United States or any of its agencies or instrumentalities."); 28 U.S.C.A. § 1655 ("the title to, real or personal property within the district").

dropped the reference to "estate," and included only the broader umbrella term of "property."  This term is most naturally read to include all species of property, including property rights to a license.

69.     Finally, a broad construction of "property" is consistent with the long-standing purpose of this removal provision: to provide a federal forum to adjudicate cases involving federal officers and their property—whether the officer is part of the case directly, or indirectly.  In 1880, the Supreme Court recognized the importance of an earlier version of this removal provision: "The legislation of a State may be unfriendly.  It may affix penalties to acts done under the immediate direction of the national government, and in obedience to its laws." *Tennessee v. Davis*, 100 U.S. 257, 263 (1880).  In such cases, removal is essential.  Otherwise, the states could accomplish what Justice Story warned could not happen: "the general government [would] cease to exist whenever it loses the power of protecting itself in the exercise of its constitutional powers." *Id.* (quoting *Martin v. Hunter's Lessee*, 14 U.S. 304, 363 (1816)). Here, New Jersey's lawsuit is quite "unfriendly" to federal law, and seeks to "affix penalties to acts done" under the federal government's intricate regulation of exports.

70.     In 1932, the Supreme Court identified a similar purpose underlying the removal statute: "to maintain the supremacy of the laws of the United States by safeguarding officers and others acting under federal authority against peril of punishment for violation of state law or obstruction or embarrassment by reason of opposing policy on the part of those exerting or controlling state power." *Colorado v. Symes*, 286 U.S. 510, 517–518 (1932).  Seven decades later, the District of Puerto Rico reaffirmed the longstanding, "underlying purposes of" this statute: to "make available the federal forum to certain property title holders . . .  while at the same time, ensur[ing] the general protection of the laws enacted by Congress, which federal judges are sworn to righteously interpret and uphold." *Benitez-Bithorn v. Rossello-Gonzalez*, 200 F. Supp. 2d 26, 31

(D.P.R. 2002). A federal forum in this case would "maintain the supremacy of the laws of the United States" and "ensur[e] the general protection of the laws enacted by Congress."

71.     The text, history, and purpose of § 1442(a)(2), along with well-settled property doctrines, supports removal in this case.

> **3.     Plaintiff's State-Court Case "Affects the Validity of" Federal Export Control Law**

72.     Third, the Plaintiff's suit "affects the validity" of federal export control law. This standard is far less stringent than the requirements for *complete* preemption, *field* preemption, or even *conflict* preemption. The Plaintiff's suit must merely "*affect* the validity" of federal export control law. In *Town of Davis v. West Virginia Power and Trans.*, the United States District Court for the Northern District of West Virginia provided a straightforward test: the Court need look "no further" than the fact that federal laws "certainly stand[] to be *frustrated* by this [state-court] action." 647 F. Supp. 2d 622, 627 (N.D. W. Va. 2007) (emphasis added). As a result, the motion to remand was denied.

73.     The United States District Court for the District of Puerto Rico relied on the *Town of Davis* framework. *Benitez-Bithorn*, 200 F. Supp. 2d at 31 (citing 647 F. Supp. 2d 622, 627 (N.D. W. Va. 2007)). In *Benitez-Bithorn*, the defendants asserted that the Plaintiff's suit would affect a federal law that "enable[d] the transfer of title [of certain property] from the U.S. Government to the Municipality of Vieques and to the Government of Puerto Rico." 200 F. Supp. 2d 26, 30 (D.P.R. 2002). The Court agreed that "the validity of said federal statute [was] at issue." *Id.* at 31. Specifically, the Plaintiff's "claims necessarily 'bring into play," the federal law. *Id.* In that case, she asserted that the federal law was "invalid, inasmuch the law orders transfer of property that allegedly belongs to her and her family." *Id.* Under § 1442(a)(2), if the Plaintiff's complaint would "frustrate" federal law, or brings the validity of a federal statute into play," then removal is

warranted.

74.     Critically, unlike with traditional removal cases, the Plaintiff's complaint can be removed even if he failed to raise any federal questions.  As a general matter, under 28 U.S.C. § 1441(a), "an action may be removed from state court to federal court only if a federal district court would have original jurisdiction over the claim in suit." *Jefferson Cty., Ala. v. Acker*, 527 U.S. 423, 430 (1999).  And "[t]o remove a case as one falling within federal-question jurisdiction, the federal question ordinarily must appear on the face of a properly pleaded complaint; an anticipated or actual federal defense generally does not qualify a case for removal." *Id.* at 431 (citing *Louisville & Nashville R. Co. v. Mottley*, 211 U.S. 149, 152 (1908)).

75.     Yet Section "1442 provides an exception to the general rule that a federal defense does not qualify a case for removal." *Town of Davis*, 647 F. Supp. 2d at 627; *see* 14C Wright & Miller § 3726 ("Section 1442 represents an exception to the well-pleaded complaint rule in the removal context because issues generally thought to be defensive in character, rather than the content of the plaintiff's claim, provide its raison d'etre.").

76.     In *Acker*, the Supreme Court recognized that under Section 1442(a)(1), a suit "may be removed despite the nonfederal cast of the complaint; the federal question element is met if the defense depends on federal law." 527 U.S. 423, 430–31 (1999) (citing *Mesa v. California*, 489 U.S. 121 (1989)).  *Town of Davis* explained that even though "*Acker* and *Mesa* involved other subsections of § 1442, this reasoning has also been applied to suits removed pursuant to § 1442(a)(2)."  Likewise, *Benitez-Bithorn* observed that "[t]he logic of a remand under § 1442(a)(2) is *identical to* a remand under subsection (a)(1)." 200 F. Supp. 2d 26, 33 (D.P.R. 2002) (emphasis

added).[5]

77.     In the present case, the Plaintiff has been quite candid about the purpose of his suit. In a press release, Attorney General Grewal expressly stated that he seeks to override the federal government's licensing framework: "The federal government is no longer willing to stop Defense Distributed from publishing this dangerous code, and so New Jersey must step up."  As noted in Plaintiff's Complaint, Attorney General Grewal seeks to "immediately halt Defendants from publishing, **exporting** and/or distributing the printable-gun computer files." Complaint at ¶ 4 (emphasis added).

78.     New Jersey can no more prohibit the operation of a federally licensed export framework than New York could prohibit the operation of a federally licensed boat, *see Gibbons v. Ogden*, 22 U.S. 1 (1824), or Maryland could prohibit the operation of a federally chartered bank. *See McCulloch v. Maryland*, 17 U.S. 316 (1819). Specifically, the Plaintiff cannot use common law nuisance and negligence claims to frustrate the State Department's exclusive authority over foreign and interstate commerce. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 375 (2000); *Nat'l Foreign Trade Council, Inc. v. Giannoulias*, 523 F. Supp. 2d 731, 738-742 (N.D. Ill. 2007).

79.     If the Plaintiff were to succeed in this matter, New Jersey would be able to prohibit all manner of exports if there could be a perceptible impact on the residents of the Garden State. Such a conclusion is untenable.  A federal forum is essential here to protect the rights of the

---

    [5] In light of *Acker*, *Town of Stratford v. City of Bridgeport*, 434 F. Supp. 712, 713-14 (D. Conn. 1977), and its progeny should no longer be considered good law: *Acker* "eliminat[ed] the sole basis given by the court in *Stratford* for remanding the case." *St. Bernard Port, Harbor & Terminal Dist., Plaintiff, v. Violet Dock Port, Inc., LLC, Defendant.*, 2011 WL 13267713 (E.D.La. 2011).

"property title holder."

80.     The Plaintiff's complaint is first, and foremost, a collateral attack on the State Department's authority to issue a license—an act that is well within federal power.   It will "frustrate" federal law and bring a federal statute into play.   Attorney General Grewal's own comments demonstrate that this case is perfectly suited for removal under 28 U.S.C. § 1442(a)(2).

### 4.     A Denial of Removal Based on 28 U.S.C. § 1442(a)(2) Can Be Appealed.

81.     As a general matter, "[a]n order remanding a case to the State court from which it was removed" based on 28 U.S.C. 1447(c) "is not reviewable on appeal or otherwise."   However, "an order remanding a case to the State court from which it was removed pursuant to *section 1442* or 1443 of this title shall be reviewable by appeal or otherwise." 28 U.S.C. 1447(d) (emphasis added).   Congress expressly permits appeals from a motion to remand based on 28 U.S.C. § 1442(a)(2).

82.     To the extent that the Plaintiff challenges this ground for removal on the basis of § 1442(a)(2), Defendants respectfully requests oral arguments on this issue.   Moreover, Defendants respectfully request that in the event of an adverse ruling, any motion to remand to state court be stayed to permit an appeal to the Third Circuit so that this question of first impression can be fully resolved.   This practice—staying a remand order pending an appeal therefrom—is an customary practice when Congress made remand decisions appealable.   *See, e.g.*, *DiTolla v. Doral Dental IPA of New York*, 469 F.3d 271, 274 (2d Cir. 2006).

## CONCLUSION AND PRAYER

83.      WHEREFORE, Defendants Defense Distributed and Cody R. Wilson pray that this Court will make the proper orders to affect removal of this cause from the Superior Court of New Jersey, Chancery Division: Essex County, to this Court and that this Court will make such other orders as may be appropriate to effectuate the preparation and filing of a true record in this cause in all proceedings that may have been had in the Superior Court of New Jersey, Chancery Division: Essex County.

**HARTMAN & WINNICKI, P.C.**
Attorneys for Defendants
Defense Distributed and Cody R. Wilson


By: /s/ Daniel L. Schmutter
        Daniel L. Schmutter


Dated: August 27, 2018